McKINSTRY *et al.*, appellants, v. SANDERS *et al.*, executors, etc

*Will — construction of — legacies — when vested.*

2 T & C 181
37 Mis²119
37 Mis²120

A will provided that the executor should convert the real and personal estate into cash, and that if, after the payment of debts and legacies, " there shall remain an amount, not exceeding $20,000, that *then* my said executor pay over the whole of said amount so remaining " to a religious society ; " but in case the amount of said moneys so remaining shall exceed $20,000, *then* my executor shall pay " to said society " only $20,000, and that he pay over the residue thereof to my nephews and nieces who shall *then* be living, to be equally divided between them." After the payment of the $20,000 there was a surplus. At the testator's death there were fourteen of his nephews and

nieces living. One niece died about a year after the death of testator, and another about two years after, but before final distribution. *Held*, that the shares of the nephews and nieces vested at the time of testator's death, and the representatives of the deceased nieces were entitled to share in the distribution.

The law favors the vesting of estates, and unless the intention is unequivocally expressed to the contrary, it will not be imputed to the testator.

ROBERT MCKINSTRY, late of the county of Columbia, died October 27th, 1870, having duly made his last will and testament and codicil thereto. At the time of the testator's death there were fourteen nephews and nieces living, of whom Jane Sanders died on the 27th of October, 1871, and Jane P. McKinstry died on the 24th of December, 1872. The last-named left a last will and testament, by which she appointed Allen Rossman executor, and which was proved since the surrogate's decree. Augustus McKinstry, on or about the 22d day of December, 1870, took upon himself the execution of the will of Robert McKinstry, deceased. The said Augustus McKinstry, as executor, etc., filed his petition for a final accounting on the 19th day of October, 1872, and on that day citations for a final accounting were issued. At the time of the filing of the petition for the final accounting as aforesaid, Jane P. McKinstry was living, and was named in the said petition as one of the nieces interested in the estate of Robert McKinstry, deceased. The citation for final accounting was duly served on said Jane P. McKinstry, but she died before the decree was made and entered, and at the time the decree was made the will of said Jane P. McKinstry, deceased, had not been admitted to probate.

By his will, the testator, after having bequeathed $6,000 as specific legacies, devised and bequeathed the balance of his entire estate to Augustus McKinstry, whom he appointed executor in trust for the purposes thereinafter mentioned. The executor was directed to sell the real estate as soon after testator's decease as he should deem expedient, and upon such terms and conditions as he should deem most beneficial for the estate, and get in and convert the personal estate into money. From such moneys the executor was directed to pay debts, funeral expenses, and the specific legacies, and with the residue invest sufficient money to produce an income to pay certain annuities, and upon the death of the annuitants, respectively, to pay the principal of such fund to the Universalist church of Hudson; and upon such church giving a satis-

factory bond to pay such annuities, then that the executor pay over to such church said fund, and also the balance of his entire estate. The will further provided, "that my said executor shall not be required to sell my real estate, or to settle up my estate in eighteen months after taking out (letters) testamentary, but that he shall be left to the free exercise of his own judgment as to the proper time to sell said real estate, and to close up and settle my estate."

By the codicil, the testator ordered and declared his will to be, "that if after the payment of all my just debts, funeral expenses, and the several legacies mentioned and bequeathed in and by my said last will and testament, the costs and expenses of settling my estate, there shall remain of the said moneys arising from the sale of my real estate, and realized from my personal estate, an amount not exceeding $20,000, that then the executor pay over the whole of the amount so remaining to said church, on his receiving the bond for securing the payment of the annuities. But in case the amount of said moneys so remaining shall exceed the sum of $20,000, then my said executor shall pay to the trustees of the said society and church, of the said moneys so remaining, only $20,000, upon the execution of the bond," * * "and that he pay over the residue thereof to my nephews and nieces who shall then be living, to be equally divided between them."

On the application of the executor, a final accounting was had before the surrogate on the 27th of January, 1872, and the surrogate made a decree on that day, ordering the executor to pay to the executors of Jane Sanders, deceased, $1,721.44, and to the personal representatives of Jane P. McKinstry, deceased, $1,721.44, as residuary legatees under said will and codicil. Seven of the nephews and nieces appealed from the surrogate's decree to this court.

*S. L. Magoon,* for appellants.

*C. P. Collier,* for Allen Rossman, executor, etc., of Jane P. McKinstry, respondent.

*J. Sanders,* for Walter T. L. Sanders, executor, etc., of Jane Sanders, respondent.

MILLER, P. J.   The testator by his will devised the residuary portion of his estate to the trustees of the First Universalist society of

the city of Hudson ; and, by a codicil subsequently executed, provided that if there should remain of the moneys arising from the sale of the real estate, and received and realized from his personal estate "an amount not exceeding the sum of twenty thousand dollars, that my executors pay over the whole of said amount so remaining to the trustees of the said First Universalist society," etc. ;   *   *   * "but, in case the amount of said moneys so remaining shall exceed the sum of twenty thousand dollars, then my said executors shall pay to the trustees,"   *   *   *   "and that he pay over the residue thereof to my nephews and nieces who shall then be living, to be equally divided between them."

The question to be determined is, the construction of the clause last cited, and the force and effect of the words "who shall then be living."

It will be noticed that the word "then" is simply employed twice in this provision of the will prior to the last sentence quoted, and evidently means *in that case,* and does not have reference to time. Its subsequent use in the same clause by no means renders it certain and conclusive that it was designed to refer to time alone, and it may well be argued that the testator intended to employ the word "then" in the same sense as he had previously done, so that it would read as before, *in that case,* thus leaving it to be fairly inferred that he designed to provide for the nephews and nieces living at the time of his decease. But, assuming that this construction cannot be upheld, I think that the interpretation of the words employed must be determined by the actual intention of the testator, to be gathered from a perusal of the entire instrum ent. . Looking at the clause in question in that point of view, it is difficult to discover any reason for claiming that the testator intended to establish a technical, arbitrary rule, by which none but those of his nephews and nieces who were living at the time of the distribution of his estate were to be objects of his bounty. The design of the will and codicil evidently was to divide all which remained after the payment of the legacy to the church, equally among this class of relatives who might be living when he died, and not to cut any of them off, because of their decease prior to actual distribution.

The effect of a contrary rule would be to deprive each one of his or her portion who might, perchance, die at any time before the surrogate's decree. In the case of Jane P. McKinstry, who died after the citation for a final accounting had been served and before

McKinstry v. Sanders.

the decree, the application of such a rule would be extremely harsh and technical. Most certainly she was entitled to a vested interest *after* the amount of the estate was definitely known, and then, if not *before*, it became vested in her. How could any other rule be applicable in this case, after the amount was known and ready to be divided? The executor was then ready to pay over, and she was then living, ready to receive, and there is no good reason why she had not an absolute right because the surrogate had not made a decree. The executor would have been justified in paying her without a decree, and had he done so, would not, I think, have been liable to account to the other distributees for the portion so paid.

In the case of Mrs. Sanders, the property was all in existence when the testator died, and one year afterward, when she died. Perhaps, with reasonable expedition in the transaction of the business, the executor may have been able to realize from the real and personal estate, so as to have ascertained what the fund was, and have been ready to distribute, if the law would allow such distribution, before her decease. Can it be said, that because this was not done, that she lost her right to the legacy, and it never became vested? I think such a rule would be at war with the intention of the testator, and cannot be upheld upon any sound legal basis.

Independent of the reasons already adverted to, there is another strong ground for the position that the testator could not have intended to limit the bequests to his nephews and nieces living at the time of the distribution; and that is, that by the will the executor is not required to sell the real estate or to settle up the estate within eighteen months after taking out letters testamentary, but is left to the free exercise of his own judgment, as to the proper time to sell the real estate and to close up and settle the entire estate. Under this provision of the will, he had the power to take such time as in his judgment might be necessary to close up the estate, and thus by delay to prevent some of the legatees from receiving their legacies, in case of their death, before distribution. Strictly construed, he was also at liberty to wait until all died but himself, before making a settlement, and thus secure to himself, if he should survive, the whole estate which remained. Conceding that this time should be reasonable, and that the executor might be compelled to distribute, by an action at law, still, before the case could be brought to a final determination, some one or more may have died, and by the delay,

have been deprived of the interest intended to be bequeathed. It cannot be supposed that the testator could have had any intention thus to vest the executor with a power so arbitrary, and leave to his will, caprice and opinion, which of the nephews and nieces, besides himself, should take the bequests under the testator's will.

The law favors the vesting of estates, and unless the intention is unequivocally expressed to the contrary, it will not be imputed to the testator.    See *Manice* v. *Manice,* 43 N. Y. 368.    In the case cited, it was held, that where shares or interests in real or personal estate, to be ascertained by a division or sale, are given by will, the estate or interest of each devisee or legatee is a vested interest, before the conversion or division.    After laying down the rule as to the intention of the testator, in regard to the avails of real estate, it is said : " A similar rule is applied as to gifts of shares or legacies, to be paid out of a fund or surplus, to be collected in, or ascertained and divided, and in those cases, the interests of the legatees are held to vest absolutely before the fund is collected or the surplus ascertained, or division actually made." * * " And where the terms of the bequest import a gift, and also a direction to pay, at a subsequent time, the legacy vests, and will not lapse by the death of the legatee before the time of payment has expired, but will pass to his personal representatives."    See, also, *Van Wyck* v. *Bloodgood,* 1 Bradf. 171, 172, and authorities cited ; 1 Jarman on Wills, 619.

In conformity with this principle, it is held that a devise of real estate to one for life, and after his death, to three others, or " to the survivors or survivor of them, their or his heirs and assigns forever," that the remainder-man takes a vested interest at the death of the testator, and that the words of survivorship refer to the death of the testator, and not to the death of the tenant for life, unless from the other parts of the will it be manifest that the interest of the testator was otherwise.    *Moore* v. *Lyons,* 25 Wend. 119. Although the case last cited relates to a provision in regard to survivors, and involves the construction of terms relating to survivors, yet the discussion covers the general question as to the interpretation of phraseology similar to that employed by the testator in the case now considered, and cases are cited and commented upon which are directly in point.    See *Boraston's Case,* 3 R. 19, where it was held that the term " then " and " when," showed when the estate in remainder should come in possession, and not when it should vest in interest, and that this latter was at the time of the death of

the testator. *Folten* v. *Williams*, Prec. in Ch. 78, and 2 Eq. Cases, Abr. 344, where it was decided, that the words "shall go to such of them as shall be living," must refer to a certain time, and that was when the legacies became payable, which was the death of the testator. *Stones* v. *Heuntry*, 1 Ves. 165, where the words "after the death" were not considered as fixing the time when the interest should vest, but merely as constituting an interest in remainder. *Doe ex rel. Wheedon* v. *Lea*, 3 T. R. 41, when the devise was to trustees with remainder to a great-nephew, "when and so soon" as he should attain his age of twenty-four years, it was held, that the words only denoted the time when the beneficial interest was to accrue, and that an estate in fee vested which was descendible to the heir at law. See, also, *Goodtitle* v. *Whitby*, 1 Burr. 228, where Lord MANSFIELD cited *Matthew Manning's Case*, 8 Co. 95, and laid down the following rule, "where an absolute property is given; and a particular interest given in the mean time," until the devisee shall come of age, etc.; and when he shall come of age, etc., then to him, etc.," the rule is that that shall not operate as a condition precedent, but as a description of the time when the remainder-man is to take possession." Although the case last cited is not exactly similar to the one considered, yet the same rule applies, and the words "then living," are not to be considered as a condition precedent to the vesting of the legacy, but a mere limitation as to the time when the legatees are to receive and enjoy the same. In *Moore* v. *Lyons*, *supra*, the chancellor, at page 144, says: "A remainder is not to be considered as contingent in any case where it may be construed to be vested consistently with the intention of the testator." The adverbs of time, therefore, such as when, then, after, from and after, etc., are construed to relate merely to the time of the enjoyment of the estate, and not to the time of its vesting in interest." And the same rule is held to apply to bequests of personal property, pages 149 and 153. See, also, 43 N. Y. 370, 371.

In *Prowitt* v. *Rodman*, 37 N. Y. 42, the testator gave certain property to his daughter during her life, and after her death "to such children as should be living at the time of her death," it was held that the expression was not limited to the immediate offspring And that the expression in the will, "children then living," may mean lawful issue or remoter descendants, if such was the intention of the testator, to be gathered from other parts of the will. See, also, *Doe dem. Barnes* v. *Provoost*, 4 Johns. 61. The effect of the cases

cited is, that words of this character are not to be taken in a literal and technical sense, but will be construed according to the testator's intention. There is also another rule applicable to legacies when the time of payment is postponed, which may be invoked in the case at bar, for the purpose of aiding in the construction of the provision in question, and that is, that where the payment is deferred, either on account of some interest in the subject being given to a person, upon whose death the gift is to take effect, or some difficulty attending the collection of the testator's effects, the bequest is considered as independent of the time named, and the legacy is vested at the death of the testator. *Dawson* v. *Killett*, 1 Bro. C. C. (Perkins' ed.) 124, note of Mr. Esten; *Hibler* v. *Whiteman*, 2 Har. 401; *Donner's appeal*, 2 Watts. F. S. 372; *Birdsall* v. *Hewlett*, 1 Paige, 32. The payment of the legacies here was postponed to enable the executor to dispose of the real estate, and convert the whole estate into money, thus making the bequests independent of the time named, and vesting the legacies at the time of the testator's death.

We have been referred by the appellant's counsel to several cases, to sustain the doctrine, that when the persons who are intended are those who shall be living at the time when a particular event shall have happened, which, in this case, is the final accounting of the executors; but I think they are not applicable, as will be seen on examination of these authorities. In *Can* v. *Robertson*, 5 N. Y. 125, a legacy was given to a church, provided that a certain clergyman, who was named, continued to be their pastor for seven years to come, but if not, then it should be paid to said clergyman, with interest. And it was held, that the condition annexed was a valid one, and that the pastoral relations between the church and the pastor, having been dissolved, by mutual consent, within the seven years, that no interest whatever vested in the church, but that the clergyman was entitled to the legacy. It will be observed, that here was a condition attached, which was not fulfilled, and upon which the right of the church to the legacy depended, while, in the case considered, there was no condition, and the authorities, as we have seen, hold that the terms employed do not operate as a condition precedent.

In *Burns* v. *Clark*, 37 Barb. 497, an express condition was imposed which was not complied with, and, therefore, the legatee took no vested interest, which is not this case. In the case of *Batsford* v. *Kebbell*, 3 Vesey, 363, it was decided that the legacy did not vest,

because the testator gave only the dividends of stock, and not the capital, before the legatee arrived at the age designated, which was not a gift, but a direction for payment, which attached only upon a person of the age named.

In my opinion, none of the authorities relied upon affect the question now considered, and as the surrogate was right in his decree, the proceedings must be affirmed, with costs of the appeal to be paid out of the estate.

P. POTTER, J. The only question presented in this case is the construction to be given to the words "*who shall then be living,*" at the conclusion of the second clause of the codicil. It is claimed by the appellants that the legacies therein given were contingent, and became vested only when the time arrived at which the executor had ascertained what amount of a fund there would be to be divided; and that the beneficiaries must also be ascertained by the number of them *then* living. In other words, it was claimed that there is a condition precedent to the estate vesting, viz.: that the beneficiary must be living at the time the executor ascertains the *extent* of the residue. This is the claim of the appellants, and it is claimed that the period of this ascertainment is the time when the decree of the surrogate fixed the *amount* of the residuary estate. At the date of this decree two of the fourteen nephews and nieces were dead, viz.: Jane Sanders and Jane P. McKinstry. Thus the appellants, claiming that the residuary estate should be divided into twelve equal shares, and only to the survivors, at the date of the decree (12) instead of fourteen who survived the testator, and to whom and to whose representatives the decree divided the estate. This presents the whole question on the part of the appellants.

Such is the construction of the human mind, and of consequence such the variation of language by testators in preparing their wills, that it has been pertinently said that "the language of will to be interpreted has no brother." This case justifies that remark. In the construction of wills, more than in any other instrument, says Lord COKE, the *intention* of the testator is the polar star to guide judges in their determination. Our courts have uniformly adopted this principle, and, therefore, in giving interpretation to wills, endeavor to carry out the intention of the testator, as far as it can be done without violating established rules of law. This intention (says Chancellor KENT) is the first great object of inquiry, and to

this object even technical rules are sometimes, and to a certain extent, made subservient. The ascertainment of this intent is sub- ject to well-settled rules of construction, from which the courts do not readily depart. It is among these rules "that it is always to be presumed that the testator intended to make a legal disposition of his estate." *Dubois* v. *Ray*, 45 N. Y. 165. So, it is always the duty of the court to give to the language used such a construction as will make the will, or the limitations in it, legal and valid, if it can be done in harmony with well-settled rules, with the manifest intent, as settled by adjudicated cases, rather than such construction as will render it nugatory and illegal, even though the latter may be accord- ing to the literal or grammatical reading. In *Butler* v. *Butler*, 3 Barb. Ch. 310, Chancellor WALWORTH said : "In the construction of wills, if the language of the testator is such that it may be con- strued in two different senses, one of which would render the dispo- sition made of his property illegal and void, and the other would render it valid, the court should give that construction to his lan- guage which will make the disposition of his property effectual." This rule was absolute in *Mason* v. *Jones*, 2 Barb. 230; *Grover* v. *Wakeman*, 11 Wend. 193. The English rule is the same. 1 P. Wms. 260 ; 4 De G. 312. And in the case of *Earl of Canrickard*, Lord HOBART said : "And here I do exceedingly commend the judges that are curious and almost subtile — *astuti* — (which is the word· used in the Proverbs of Solomon, in a good sense when it is to a good end) to invent reasons and means to make acts according to the just intent of the parties, and to be wrought out of the act." Hobart, 277, *b*.

In *Inglis* v. *Sailors' Snug Harbor*, 3 Pet. 177, it was said : " That a *general* intent in a will is to be carried into effect at the expense of any *particular* intent, provided such general intent be consistent with rules of law," and "*that* construction is to be preferred, which, consistent with rules of law, gives effect to the greatest part of it." *Gallini* v. *Doe*, 3 Adol. & Ellis, 341. " Where the words of a gift are themselves plain, distinct, and capable of having a legal effect, effect must be given to them, notwithstanding any improbability which may arise from looking at other parts of the will. Parsons on Wills, 32. " Where the actual and primary intent of the testator, as collected from the whole will, is in harmony with the policy of the law, and of established principles of equity, the court will aid it by giving it such a construction." *Paterson* v. *Ellis*, 11 Wend. 293.

" Where the *intention* of the testator is in doubt, the courts will incline to favor such intent as will hold to the *vesting* of the estate, and the clear *literal* interpretation of words in a will may be departed from, if they will bear another construction where other parts of the will manifest a different intention, and the court frequently rejects the strictly grammatical sense, to carry into effect such intent of the testator." *Rathbone* v. *Dyckman*, 3 Paige, 29. The courts will always *favor* such a construction as *vests* the estate, *never*. That construction would hold the estate in *abeyance*, and only from *necessity*, a construction that the estate is *contingent*. Where a general intent is apparent from the face of the will, *words*, expressing a particular intent, must give way to the intent which is general, and so this construction is to be made upon the *whole* instrument, and not upon a disjointed portion or single section of it, in order *that* all its parts are to be construed with reference to each other. These general rules may be called in to aid in giving interpretation to the single sentence of the will in question.

Two important questions are first presented in this case :

1. Interpreted in the light of the above general rules, who did the testator intend should have title to and enjoy this residuary estate?

2. When, and in whom, did the interest therein vest?

*First.* Does the *survivorship* in this case, expressed in the terms *" who shall then be living,"* refer to the death of the testator, or to the dying of some one or more of his nephews and nieces after his death, and before the day of the payment of the legacies ? Or

*Second.* Does this survivorship depend upon a period certain and determined by law, or upon an uncertain period in the future, dependent upon some future occurrence, controlled by the action or volition of a third person, or other persons ?

*Third.* Does this survivorship depend upon a period to be determined by law, independent of either the death of the testator or the action of the executors ?

In determining these questions, it becomes necessary to inquire whether the interest of these legatees of the residuary estate was *vested* or *contingent.* The devise, in the first instance, to the executor in trust, is authorized by the Revised Statutes (1 R. S. 728, § 55, sub. 2), and could continue only for such time as was necessary to accomplish the purpose for which it was created. Laws of 1843, ch. 318, § 4 ; Laws of 1841, ch. 261 ; 3 R. S. (5th ed.) 16, 17, §§ 59, 60. The interest of the legacies is not, therefore, vested in him.

It is a settled rule of construction, that an estate in remainder is *vested*, unless the contrary intention expressly appears upon the face of the will. It is seen, by the provisions of this will, that the devise of the residuary estate to the trustee was only in trust for the uses and purposes set forth in the will, and it vested in him a legal estate only for such purpose. It was, in effect, as declared by the Revised Statutes, a power in trust, for the benefit of the *cestuis que trust* — a mere naked trust, no further coupled with an interest than that he himself was one of the *cestuis que trust* — a tenant, in common with others. There was no power to accumulate or to receive rents and profits. *Downing* v. *Marshall*, 23 N. Y. 380. This question of the interest, being a *vested* one, was held as above stated. In *Perry* v. *Woods*, 3 Ves. 208; *Roebuck* v. *Dean*, 2 id. 265; *Doe ex dem. Long* v. *Prigg*, 8 B. & C. 236.

In this latter case, the court said : " The law inclines to such a construction as will tend to *vest* a remainder, unless a contrary intention appears, because *contingent* remainders are in the power of the particular tenant, and may be destroyed, and it is more likely the testator intended the limitation should be made secure, than that they should be defeated." So here, it ought not to be presumed that the testator intended that the trustee, by any caprice on his part, or by delay in his action, which his individual interest might dictate, or by his death, and the delay occasioned thereby, or by any delay on the part of the surrogate, intended or accidental, should defeat the interest of any one of the intended beneficiaries. This English rule was recognized and adopted in this State in the court of errors, in *Moore* v. *Lyons*, 25 Wend. 137. At page 144 of that case, the chancellor uses this strong language: " A remainder is *not* to be considered as *contingent in any case*, where it may be construed to be *vested*, consistently with the intention of the testator." In the case of *Manice* v. *Manice*, 43 N. Y. 368, RAPALLO, J., in delivering the opinion of the court, says: " It may be laid down as a general rule, that where, by a will, shares or interests in real or personal estates, *to be ascertained by a division*, are given, or where real estate is directed to be sold and the proceeds divided, the estate or interest of the devisee or legatee in the property so to be divided or converted is a *vested interest*, before the conversion or division." This proposition applies with all its force to the case at bar.

In the construction of a provision of a will there is no difference

McKinstry v. Sanders.

in the rule we have stated as to determining when the interest is *vested* and when *contingent*. It is the same rule in cases where the interest given follows a *remainder*, and when it is a mere limitation. A remainder depends upon the existence of a precedent estate, and vests at the creation of the estate. There is no other contingency in that case than as to the time of its enjoyment in possession, by the determination of the precedent estate, which day may be uncertain. In the case at bar, there is no *precedent estate;* and the interest given is not a *remainder*. Still, it is a vested interest. The estate is devised directly to the *cestuis que* trust, through a power in trust, to be executed for them. Such a devise is not a trust estate, but a power. No estate vests in the trustee, except as a tenant in common with the other beneficiaries. Nor does the estate come within the meaning of "an executory devise," which is defined to be "a devise of a *future estate* in lands, not to take effect at the testator's death, but limited to arise and *vest* upon some future contingency." Whatever may be its classification among estates, it comes exactly within the rule laid down in *Manice* v. *Manice, supra.* In the further discussion of the case under this point, we shall confine ourselves to the question generally of the time of devised estates vesting, and hold that the rule, as to *limitations* and *conditions*, is the same as it is in regard to *remainders*. It is claimed that there is, in this case, no devise or bequest in the will to the two deceased nieces. This argument, I think, is not sound. Story lays down the rule thus: "If a testator should, by his own will, desire his executor to give a particular person a certain sum of money, it would be construed to be a legacy." Eq. Juris., § 1068. Here was a direction *to pay* his nephews and nieces all his residuary estate in money. It was, therefore, a legacy; and it makes no difference whether the gift was to one or to a class, it was a legacy. These words, then, will not be construed to be a contingent limitation, to take effect on such future day as may be fixed for distribution; or such day as it shall please the trustee to settle the estate, or the surrogate to act. This is not the rule in any case, unless the language of the will unequivocally expresses the intention that the vesting of the estates of the beneficiaries shall be postponed to such future day. *Manice* v. *Manice, supra.* It is not so expressed in the will in the case before us.

It was added, in the last cited case, "If the *intention* (otherwise) is unequivocally expressed, effect must be given to it; but *such* an intention will not be imputed to the testator *if it can be avoided."*

And it was further held in that case, "that a limitation over, to take effect in case of the death of the legatee before he has received his share, *does not take effect if the legatee lives to become entitled to it, though he die before it has been paid.*" Id., page 369. To the same effect are the cases *Everitt* v. *Everitt*, 29 N. Y. 40; *Traver* v. *Schell*, 20 id. 89; *Doe, ex dem. Barnes* v. *Provoost*, 4 Johns. 61. Parsons on Wills (74), says: If a legacy is bequeathed to one, to be paid or payable at some future time, it is nevertheless a *vested* legacy; and if the legatee die before the period of payment, it will go to his executor or administrator, and is then payable at the time he would have received it had he lived. It is an interest commencing (vesting) *in præsenti*, though *solvendum in futuro.*" A recent case in the court of appeals (*Livingston* v. *Greene*, 52 N. Y. 118) was a devise to children, which could be conveyed to them only "*after*" and "*upon the death of my wife.*" It was held that these words did not make a *contingency*, but simply indicated when the estate took effect *in possession*, that the children took a *vested* remainder, not subject to be defeated by their death prior to that of the widow; and it was also held in that case that the words in the will, "*should any of my children die,*" etc., could be construed to refer to *a death* after that of the testator, and before that of his widow, and it did not affect the interest of a child living at the death of the testator. No further cases need be cited to prove that each of the nephews and nieces of the testator living at his death, or, as we shall see hereafter, at the time the residuum was ascertained, had a *vested* interest in the residuary estate.

Under the provisions of this will and codicil, all the residuary estate of the testator, real and personal, was devised and bequeathed to Augustus McKinstry (his nephew), *in trust*, to be converted into money, and to be distributed in the following order to two classes of legatees: In the first class to the Universalist church and society of Hudson the amount of $20,000, if so much there should be; and, in the second class, to the nephews and nieces of the testator, the remainder thereof. Of this class, at the testator's death, were fourteen persons, of which the trustee and executor was one. The interest of these several legatees, the church as well as the nephews and nieces, was, by the authorities I have cited, a vested interest, commencing at the death of the testator, with no difference except as to the order of payment. They all alike took an immediate vested interest in equity, the church to the amount of $20,000, con-

tingent only (not in vesting, but in enjoyment) upon such residue being equal to the said sum, and a vested interest in the said nephews and nieces, upon there being a surplus exceeding the said $20,000. There being such a residuum in existence at the testator's death, there was no contingency as to there being an estate to take; the estate *vested* in interest immediately in all the nephews and nieces, and vested in enjoyment, on the distribution. The testator divided all his estate. The will took effect upon his death, upon all the estate devised. The rights of all the parties then became fixed, and it vested in all the beneficiaries. The will conferred no power upon the trustee to create a contingency, or to withhold from any *cestui que* trust his or her appropriate share, when the day of enjoyment should arrive, which day of enjoyment, only, was made to depend upon the closing up and settling of the estate, which, by the provisions of the will, the trustee was not compelled to do within eighteen months. But in that regard, this permission was no limitation upon his power to act at an earlier day, but he was left to the free exercise of his own discretion and judgment to act within that time. For aught that appears in the case he did act. It cannot be claimed that the giving of time to settle the estate, of itself, worked any change in the vested rights of the *legatees*, or created any contingency as to the vesting of their interests ; nor did it alter the fact of there being a residuum, at the testator's death, to be divided; it only postponed the day of its enjoyment. The ascertainment of the *amount* of the residuum to be divided had no effect upon its vesting. Besides, these legacies were, in one sense, specific, and it is also a rule that a *specific* legacy vests immediately upon the testator's death, and it requires express language to the contrary to prevent it. Pars. on Wills, 71.

*Second.* Does the survivorship of nephews and nieces, expressed in this codicil by the words, " *who shall then be living*," refer to the death of the testator ? If not, to what time does it refer ? To whatever time it shall be held to refer, I regard it as settled law, that the time of its vesting must be a time *certain*. Even literally considered, the word " *then* " refers to a time certain. It cannot, in law, be a time indefinite or uncertain. It cannot be made so uncertain as to depend upon the will, conduct or caprice of a third person. From the language of this codicil, and by due legal construction, no other time is legally certain than the time of the death of the testator, or, if legally it may be a day certain in the future, it can

only be the time when first the power of division can be exercised by the trustee. I do not assert the soundness of the latter; but we can examine the case upon each of these hypotheses, as if each were equally sound.

The case of *Trotter* v. *Williams*, 2 Eq. Ca. Abr. 344, cited from 25 Wend. 132, was a bequest to A of £500, to B £500 and to five others, £500 each. "And if any *die*, then her legacy, and also the residue of the testator's personal estate, go to such of them *as shall be living.*" It was held "that the dying must refer to *a time certain.*" That certain time was held to be the death of the testator, so that the dying of any one of the legatees subsequent thereto would not carry it to the survivors, but to the representatives of the one dying. In the case of *Lord Bindon* v. *The Earl of Suffolk*, reported in 1 Peere. Wms. 96, the Lord Chancellor said "that the surviving must apply to some particular time." The words of the devise in that case, after giving £20,000 to four sons and one daughter of his brother (his nephews and niece), were as follows: "*Equally to be divided* between them, share and share alike; *and if either of them should die, then to the survivors or survivor of them.*" One of the sons died after the testator, but before any part of the money was paid, and the question was upon his share. It was held, that the *dying* referred to the death of the testator. That case in all its features, and the language of the will, in legal effect, is like the case at bar. In that case, if *either should die*, the survivors take. In the case at bar, the survivors take who shall be then living. There is no difference in the effect of the language. In that case, as in the case at bar, the court held the devisees and legatees to be tenants in common, and not joint tenants. In both cases, the *dying* and *surviving* refer to a time certain; and that time, it seems, is the death of the testator. It is laid down by Jarman (2 Jarm. on Wills, 162), as a general rule, "that all expressions in a will, importing a *division by equal shares* to the devisees, will operate to create a tenancy in common." In the bequest before us, to the nephews and nieces, are the words, "*to be equally divided between them.*" In whomsoever, therefore, this interest vested, and whenever it vested, the beneficiaries were tenants in common. This I regard as an important point in the case. The case of *Stringer* v. *Phillips*, 1 Eq. Ca. Abr. 292, was a devise to five persons, to be equally divided between them, and the survivor and survivors of them, and if A (one of the five) "*shall die before his marriage, his share to go to another person.*" It was held that the

dying and surviving related to the death of the testator, and this distinction (which is ever important) should be kept in mind, viz.: If surviving referred to the death of the testator, the five were tenants in common; if it referred to the survivors *after* the testator's death, they would be joint tenants. It was held they took as tenants in common. Courts of equity never favor a joint tenancy, when the language permits of a tenancy in common. Worth. on Wills, 286. *Heathe* v. *Heathe*, 2 Atk. 122; *Haws* v. *Haws*, 3 id. 524. Some of the above cited cases, and many others to the same effect, are reviewed and approved in *Moore* v. *Lyon, supra*. That was a thoroughly argued, and fully considered case, in the highest court of the State, and the rule was there broadly laid down, that a devise of a remainder is never to be taken as contingent as to the time of its *vesting*, unless it is so clearly and unequivocally expressed in the will itself, that, by necessary implication, no other construction can be placed upon its language, This emphatic rule was repealed in effect by RAPALLO, J., in *Manice* v. *Manice*, 43 N. Y. 368; and he cites in its support also, 6 Cruise's Dig. 444, § 11, and 3 T. R. 488.

This view of authority upon the two preceding points brings the bequest in the case at bar to be a vested interest in all of the fourteen nephews and nieces of the testator, and that they are all equally tenants in common in the residuum. Such a construction not only brings the case within well-established legal rules, but has a basis of equity and justice to support and uphold it. The opposite construction is without legal authority for its support; its basis is a *technical* literal reading of a single sentence, disjointed from the general scope and intent of the whole instrument; a construction that makes *contingent* the interests of some or all the beneficiaries under its provisions; puts the inheritance and estate in abeyance, which is never allowed, and places the whole residuum in the power of the trustee, to vest in *interest* at an uncertain day, subject, to some extent, to his will or caprice. No case can be found, I think, that will sustain such a construction. There is nothing in the language of the will or codicil, nothing in the surrounding circumstances of the case to warrant the conclusion that the testator did not regard with equal affection each of the fourteen nephews and nieces who came to be beneficiaries at his death. They were all equally near to him in blood, and it may be presumed, in fact, equally dependent upon his bounty, and if we take from the language of the will what is the legal presumption, it is expressed

in *Barker* v. *Giles, supra,* " joint tenantcy is an odious title in equity; it will never be held by construction, if a tenantcy in common can be presumed; that '*survivors*' shall be understood to mean such as were living at testator's death," and as was also said, "there being being no reason that because a man lived longest and had a better constitution, therefore he should be entitled to the whole estate." Chancellor WALWORTH, in *Moore* v. *Lyon, supra,* said : " The weight of authority both here and in England unquestionably is in favor of applying the *terms* of survivorship upon the devise of a remainder, to the death of the testator." The words, " *who shall be then living,*" are clearly words of survivorship. There is no difference, in effect or in meaning, between the two expressions, — " *shall pay to the survivors,*" and " *shall pay to such as shall then be living.*"

*Third.* But it is claimed by the appellants, and upon this claim the whole argument depends, that though the interest in this residuum may have vested at the testator's death, it was a *contingent vesting,* dependent upon their surviving the day of settling the estate; that in this view, the word " *then* " is absolutely controlling as to the number of beneficiaries who shall be entitled, and means only such as shall then be living. I cannot adopt that construction. It has already been shown that such a construction would make it an illegal devise. This would be so, even if such was actually the testator's intent. In the case of *Atkinson* v. *Hutchinson,* 3 P. Wms. 259, the Lord Chancellor said : " I admit the devise of a trust must have the same construction as that of a legal estate, and that accidents subsequent to the making the will shall not in anywise affect such construction. And further, that though the intention of the testator is greatly to be regarded, y,et this intention *must ever be consistent with the rules of law.*" The words in question are capable of another and of a legal construction. And as was held in the last cited case, " where words of a will are capable of a two-fold construction, it is just and reasonable that they should receive such construction as tends to make it good." This adverb,. " *then,*" is, by well-settled rules of law, capable of being made to refer to another time than that of the day of settlement of the estate. We may look at extrinsic circumstances to point at the intent of a testator in the use of words capable of more than one meaning. The will, of course, was prepared in the testator's lifetime. This word " *then,*" at the time of writing, in his mind, referred

to some future day. The law requires it to be a day certain. This certain day was either the day of his death, or some other day certain in law, because . "*then*" is here an adverb of time. To give legal effect to this will, the court are placed in the alternative of construing the word "*then*" to refer to the death of the testator, or to some other day certain, in order that the estate may vest, rather than it should remain contingent. Authority must settle this. *Boraston's case*, 3 R. 19, is in point. That was a devise of lands for eight years, and afterward to executors for the performance of the will, till the testator's son should attain the full age of twenty-one years, and *when* he should come of age, *then* he should enjoy the same to him and his heirs. The son died under age. *Held*, 1st. That this was a good devise of the *term* until he should attain the age of twenty-one, and that the interest of the executors continued until such time as he would have been of age, had he lived. 2d. That the remainder was executed (vested) in the son, and was not in contingency. That the adverbs, "*when*" and "*then*," only denoted the time when the remainder was to take effect in possession, and not when the remainder should *vest*. The adverb "*then*," in the case at bar, does denote the time of taking possession ; but it is claimed that it has another and a double meaning, to wit, the time of vesting in interest, and also of its vesting in possession. Such a construction would have the interest either *contingent* or in *abeyance* during the period between the testator's death and the day of payment. This, as we have seen, cannot be. *Boraston's case* settles three points in the case at bar : 1st. That this residuum was *vested* at the testator's death ; 2d, that the adverb *then* related to the time of enjoyment, in distinction from its vesting in interest ; and, 3d, that the time of vesting of an estate is a time certain. That case was recognized and adopted as sound in the court of errors in this State, in *Moore* v. *Lyon*, *supra*, in which the chancellor said, "the adverbs of time, such as *when, then, after, from, and after*, etc., are construed to relate merely to the time of the enjoyment of the estate, and not to the time of its vesting the interest."

But it is claimed that this adverb *then*, if it cannot legally refer to the day of the payment, may refer to the day when it is ascertained that there is a residuum for the nephews and nieces of the testator, and that such is the literal and grammatical reading of the sentence, "*who shall then be living.*"

This would be a far more sensible construction than to refer the day of vesting the interest to the day of its payment, or to the day of the surrogate's decree, for the reason that the day of ascertainment of the existence must be a day certain — physically certain; and a day which the law would determine and establish; whereas, the other construction would be a day uncertain — a day dependent upon the volition of an individual, interested in postponing the day of its vesting; or it may be dependent upon the volition, or convenience, or death of the surrogate, which might delay and make uncertain the day of its vesting.

But I do not think this adverb " *then*," in this last branch of the sentence, is to be construed, or that its meaning is according to this last proposition of the counsel of the appellants. Its meaning is controlled and qualified by the whole paragraph, or latter portion of the paragraph with which it is connected, the whole of which must be read in connection, in order to ascertain its bearing. So reading it, the manifest intent and legal effect will appear. In its legal reading, some words (understood but not expressed) may be supplied. The context reads thus : " *But in case the amount of moneys so remaining shall exceed the sum of* $20,000, *then* " (that is at that time — or, in that case — or, when that result happens) " *my executors shall pay to the trustees of the said Universalist Society and church, of the said moneys so remaining, only* $20,000 and that he " (" then " legally understood) " *pay over the residue thereof to my nephews and nieces who shall ' then ' *" (that is, at the time the moneys so remaining shall exceed $20,000) " *be living, to be equally divided between them.*" Thus reading it, literally, and according to its legal interpretation, the adverb " *then*," last occurring, refers not to the time of payment — not to the decree which only fixes the *amount* to be paid, but to the *time* when the residuum shall be ascertained to exceed $20,000. This excess of $20,000, *then*, at least, if not at the death of the testator, *vested* in such of the nephews and nieces as were *then* living. This is not only the literal and legal, but it is, as I think, the correct grammatical reading of the sentence. It is the only reading that can give legal effect to the gift. By every rule of construction known to the law, or in equity, the courts are bound, not only, if possible, to give legal effect to the will, but to give it an interpretation that will *vest* the estate — to make the time of its vesting a certain, and not uncertain time; to lean against a construction that would make the gift contingent;

or hold the estate in abeyance, and to hold that the legatees take the estate as tenants in common, and not as joint tenants. This last construction, upon this fair reading of the language of the will, taken altogether, and not by disjointed sentences, brings the provision within all the established rules of interpretation which we have presented. If the estate becomes legally vested by adopting either of these alternatives as to the time, it requires clear, express and unequivocal terms to divest it. No such terms are found in the will. Jarman, in his treatise (2 Jarm. on Wills, 97), lays down this rule in regard to bequests to *children:* "Where mention is made of the *objects* of the devise, at the period of distribution, this is not intended to designate *children* existing at *that* period; for it has already been shown that all who have existed at the interval between the death of the testator and the period of distribution, whether living or dead at the latter period, are the objects of the gift; and may, therefore, not improperly be termed objects *at that period,* their decease before the period of distribution having no other effect than to substitute their respective representatives." If this is the rule as to children, it is the rule as to nephews and nieces.

It was certainly a reasonable provision of this will that the trustee should have time given to settle the estate before he should be required to pay it over to the legatees, and thus to postpone, if necessary, the day they should be permitted to enjoy it; but I can find nothing in this provision of any evidence of a legal intent to cut off any of these beneficiaries, by reason of their want of strength to live to the day of this distribution, or to cut off their legal representatives from taking, on account of a providential dying of the legatee, before the payment of the legacy. At the death of the testator, as we have attempted to show, his whole estate vested, if such construction is possible, vested in somebody; or, it must be a *contingent limitation,* if no other construction can be given. We have shown that it was not vested in the trustee, except for the purposes of the trust, and that it is only a power in trust. The will, in law, speaks from the testator's death. Then he had fourteen nephews and nieces living. This residuum, if it then existed, it then vested in these fourteen as tenants in common. Or, if it did not *then* vest, it did so vest at the instant it was ascertained there was a residuum to be divided. The date of this instant of time is not furnished by the case. It is not shown that this period of time was subsequent to the

death of either of the two deceased nieces. Assuming, then, in the remaining discussion of the case, that the *vesting* is at this last-mentioned period, then the argument that, at the death of the testator, the interest of these nephews and nieces were severally contingent upon their living to the day of its vesting is completely answered. But I have looked in vain for a *contingent* estate, that was dependent upon its vesting upon such an uncertain day, as a day to be determined by the chance or accident of the exercise of the will, volition, pleasure or caprice of a third person interested in its postponement, and by whose protracted postponement he himself might become the survivor of all the aged or infirm co-legatees, and thus possess himself, by survivorship, of the whole estate by a wrongful omission to act. Equity would refuse to give such an interpretation to a devise. Such a contingent estate, I think, is not known to the law. I can find no authority to sustain it. It seems to me to be little short of a legal absurdity so to hold. If the estate is vested at either period, viz., the death of the testator, or even at the moment when it was ascertained that there was a residuum to be divided, no subsequent omission to act by the executor and trustee, or by the surrogate, or by the death of either, or by any other delay, can defeat a vested estate. And such a condition of the estate, or such a happening, does not make the estate contingent.

The death of the testator, or the day of ascertaining the existence of this residuum, settled the fact of its existence and of its vesting. The day directed in the codicil to pay it over is only the day when the *amount* is ascertained and settled. This latter day had nothing in it that settled the legal day of its vesting. It was the legal duty of the trustee to pay it when the estate had been converted into money. If either the trustee or surrogate had refused to act after the estate was converted into money, when duty demanded their action, equity would have interposed and have performed the act itself at the proper time ; and, if needful to that end, will appoint a trustee to perform it, and will regard as done and completed at that instant of time, the act or thing that equity and good conscience requires should then have been done. Lewin on Trusts, §§ 526, 693 to 697; *Kane* v. *Goit*, 24 Wend. 660; 5 Barb. 196; *De Peyster* v. *Clendinin*, 8 Paige, 310; Story on Eq. Jur., § 1061. This point of the appellants, therefore, of a contingent vesting in each legatee of this class, subject to their surviving *to the day of settling the estate*, is not sound. Such a contingent vesting will not be imputed

as an intent of the testator, or implied from the language of the will, and, even if clearly expressed, I think it would be an illegal trust, creating a suspension of ownership, and unauthorized by the Revised Statutes.

But if we are in error as to all the views above expressed, I am unable to see how, upon the case presented to us, we can reverse the decree of the surrogate. The appellants show no error in the decree. Though the will allowed time to the trustee to settle this estate, and to exercise his own judgment and discretion as to the time to sell the real estate and close up the whole estate, it did not restrain him from acting immediately, and he was also authorized to act at once. The will expressly authorized him to sell as soon as he should deem expedient. The condition of the estate at the testator's death is not shown. For aught that appears, there was little real estate to be sold, it may all have been converted into money before the testator's death, except $16,331.03, mentioned in the executor's schedule as the amount of sales of real estate under the will; and there is no evidence of the time of *this* sale. The residuum to the nephews and neices was payable at the same time as the legacy to the Universalist church. It nowhere appears when he paid that legacy, nor that he did not pay the legacy to this church within three months of the testator's death. It nowhere appears that the trustee did not have the whole residue in hand to be paid to these fourteen beneficiaries, before the death of any one of them; if so, it was their due, and he was in the wrong in withholding it. A court of equity would have enforced the payment in such case; they would regard as done what ought to have been done, and any delay or wrong in withholding it could not inure to his or the other survivors' benefit. In fact, there is nothing in the case to show that the surrogate had not the full evidence before him, in this regard, to justify and uphold the decree. Indeed, the surrogate certifies, that on the hearing, all the parties having appeared, and objections having been made, *" and the said parties having submitted certain proofs in this matter,* and after hearing the arguments of the respective counsel herein, upon the construction of the last will and testament, and codicil annexed, * * I thereupon entered the decree," etc. There was, then, evidence not presented to us. Upon the appellant was the burden of showing error. In the absence of error being shown, it is the duty of this court to uphold the decree. Surely it cannot be denied that it was the duty

of the trustee to pay over this residue when it came to his hands. We must assume that the surrogate had before him the proper evidence in that regard, and that, upon that evidence, he did what equity and good conscience required him to do. We may also presume that money came to his hands before the death of either of the nieces. For aught we can know from the case the surrogate acted right, and had sufficient evidence to support the decree. Equity has been done.

Upon the whole case, I think the decree of the surrogate should be affirmed.

PARKER, J., dissenting. This is an appeal from the decree of the surrogate of the county of Columbia, made upon a final accounting before him, of Augustus McKinstry, executor, etc., of Robert McKinstry, deceased.

Robert McKinstry, late of the city of Hudson, of said county, died on the 27th day of October, 1870, having previously made his last will and testament, and a codicil thereto, which were duly admitted to probate, as a will of real and personal estate, on the 22d day of December, 1870.

By the will, which bears date the 19th day of November, 1864, after giving various legacies, he devises and bequeaths all his estate, real and personal, to his nephew, Augustus McKinstry, in *trust*, to convert the same into money, and, after payment of his debts and funeral expenses, to pay in full the several legacies thereinbefore bequeathed, and from the residue of said moneys to invest, in his own name, a sum sufficient to produce annually the net sum of $275, which he is to pay out in certain prescribed annuities, and what shall remain of said moneys, after such investment, to pay over to the trustees of the First Universalist society and church in the city of Hudson, for the use and benefit of said society and church; and upon the death of the annuitants, severally, such share of the sum invested as produces the annuity of each is to be paid over to said society and church for the use and benefit thereof. He then appoints the said Augustus McKinstry the sole executor of said will.

On the 13th day of December, 1869, the testator executed a codicil to said will, in and by which he declared and directed, that if, after payment of his debts and funeral expenses, and the several legacies mentioned and bequeathed in his will, and the costs and expenses

of settling his estate, there should remain, of the moneys arising from the sale of his real estate, and realized from his personal estate, an amount not exceeding $20,000, then his said executor "pay over the whole of said amount so remaining to the trustees of the First Universalist society and church in the city of Hudson, for the use and benefit of said society and church, upon the said society and church, or any one in its behalf, executing a bond or other proper instrument, securing the payment to my brother, Henry McKinstry, during his natural life, the sum of one hundred dollars annually, and to my niece, Mary Ann McKinstry, during her natural life, the sum of seventy-five dollars annually; such bond to be approved of by my said executor as to its sufficiency, for such purpose. But in case the amount of said moneys so remaining shall exceed the sum of twenty thousand dollars, then my executor shall pay to the trustees of said society and church of the moneys so remaining only twenty thousand dollars for the use and benefit of the said society and church, upon the execution of a bond or instrument as above-mentioned for the payment of the above-mentioned annuities to my brother Henry, and my niece Mary Ann McKinstry, and that he pay over the residue thereof to my nephews and nieces *who shall then be living*, to be equally divided between them."

At the time of his death the testator had nephews and nieces living who survived him, to the number of fourteen, two of whom had died before the making of said decree, to wit: Jane Sanders, on the 27th day of October, 1871, and Jane P. McKinstry, on the 24th day of December, 1872.

Upon the 19th day of October, 1872, the executor made his application, by petition to the surrogate, for a fixed accounting, which was perfected, and the decree thereupon entered on the 27th day of January, 1873.

Upon such final accounting, it was found and determined that, after payment of debts and legacies and expense of settling the estate, and of the $20,000 to the said society and church, there remained a surplus or residue in the hands of the executor of $24,100.16, to be paid over to nephews and nieces of the testator, in pursuance of the residuary bequest in the codicil, and the surrogate divided such surplus or residue into fourteen equal parts, of $1,721.44 each, and after decreeing to each of said nephews and nieces then living one of said shares, directed and decreed that one of said equal shares be paid by the executor to the personal representatives

of each of said nieces who had died before the making of said decree.

From this part of the decree, giving portions of such residue to the representatives of the deceased nieces, this appeal is taken, by six surviving nephews and nieces, one of said six having obtained the transfer of, and now owning in addition to her own, the share of a surviving nephew.

The question raised is upon the construction of the last clause of the codicil above referred to, to wit: *"And that he pay over the residue thereof to my nephews aud nieces who shall then be living, to be equally divided between them."*

What is the force and effect of the expression "who shall then be living," in that clause ? The surrogate so interpreted this expression as to entitle each of the fourteen nephews and nieces, living at the testator's death, to an equal share of such residue, while the appellants claim that the bequest is limited to those living at the time of the making of the decree upon the final accounting.

If any effect is to be given to the words *"who shall then be living,"* I can see no other than that claimed by the appellants. I am quite unable so to construe the sentence as to make the words refer to the time of testator's death.

If such construction could be fairly placed upon them, I confess that would be the one which I should think ought to be adopted. But that I think is quite impossible.

This residuary provision is in respect to a portion of a trust fund, uncertain in respect to its existence and amount. The testator, in considering what the trustee shall do with it, in the event that a surplus be found to exist, directs that he pay it over " to my nephews and nieces *who shall then be living."* If it had been merely " to my nephews and nieces," then, doubtless, all his nephews and nieces, living at the time of his death, would have been intended, but he adds, *" who shall then be living,"* most clearly distinguishing between *all* his nephews and nieces, surviving him, and those who shall be living, when the time comes, in which the trustee is to pay over such residue. The question is one of identification of the legatees, rather than one of time, when the legacies shall vest.

The persons to receive the surplus are indicated by the description, "my nephews and nieces who shall then be living," *then,* when the executor and trustee shall, after having converted the estate, real and personal, into money, have paid debts, legacies, *and expenses*

*of settling the estate*, and established, upon an accounting and settlement before the surrogate, what amount of surplus, or residue, beyond the legacy to the Universalist society and church, if any, will remain for distribution. The point of time when this shall have been accomplished is the time indicated by the word *then* in the phrase "who shall then be living." The above are not only the immediate and natural antecedents of the word *then* in the phrase, but the only ones, or their culmination the only one, to which in the natural and grammatical construction, or by any interpretation of the language, it can refer.

Nothing can be clearer, I think, than that such is the plain import of the language under consideration; and unless this language can be disregarded, the construction adopted by the surrogate cannot be sustained. I know of no canon of interpretation in the construction of wills that requires or allows the setting aside of plain and unequivocal language.

The intention of the testator, which is the end always sought in the construction of wills, is to be ascertained, if possible, from the language of the will, and when that is expressed in plain and unambiguous language, interpretation is not required. The maxim of Vattel, in regard to treaties and other instruments, is applicable: " The first general maxim of interpretation is, that it is not permitted to interpret what has no need of interpretation. When an act is conceived in clear and precise terms, where the sense is manifest, and leads to nothing absurd, there can be no reason to refuse the sense which this treaty naturally presents. To go elsewhere in search of conjectures, in order to restrain or extinguish it, is to endeavor to elude it." Potter's Dwarris, 126. It is one of Mr. Jarman's rules of construction, that "words in general are to be taken in their ordinary and grammatical sense, unless a clear intention to use them in another can be collected, and that other ascertained." Also, that " the inconvenience or absurdity of a devise is no ground for varying the construction, when the terms are unambiguous." 2 Jarman on Wills, 743.

Much stress is laid by respondent's counsel upon the circumstance that, if the appellants' construction is to prevail, the consequence will be that the executor and trustee, himself one of the nephews of the testator, and comparatively a young man, has it in his power to delay the time when the shares will eventually vest, to his own advantage, from the dying off of distributees in the mean

time, inasmuch as he is left, by the express terms of the will, "to the free exercise of his own judgment as to the proper time to sell the real estate, and settle up the estate."

This effect of the construction of the residuary bequest, in accordance with its plain terms and manifest sense, is no ground for varying the construction, by striking out the words " *who shall then be living,*" or by an injurious torturing of the language into an unnatural and artificial meaning, which would be the effect of the construction of the learned counsel for one of the respondents. The word " *then,*" it is urged, is not here an adverb of time, but refers merely to the fact or circumstance that there is a residuum; as if the will and codicil [it is said] had read as follows :

" Whereas, it is uncertain whether the estate I shall leave at my death will exceed $20,000, after payment of my debts and specific legacies, and expenses of administration ; now, therefore, *in case it does,* my will is, that such residue shall go to my nephews and nieces who shall survive me." This is a paraphrase which the language will by no means bear. The word " *then*" is, undoubtedly, in some connections, a conjunction, meaning, " *in that case.*" It is so used in a previous part of the same sentence, " but in case the amount of said moneys so remaining shall exceed the sum of $20,000, *then,* my said executor shall pay," etc., meaning, " *in that case,* my said executor shall pay." But it is plain that in the portion of the sentence here in question, to wit, " that he pay over the residue thereof to my nephews and nieces who shall *then* be living," the word " *then*" can have no such meaning, but is clearly an adverb of time. If it had been " in case the amount so remaining shall exceed $20,000, *then* my executor shall pay such excess to my nephews and nieces, equally to be divided between them," the meaning given by the learned counsel to the word " *then*" would be appropriate, and the paraphrase correct. The force of the word " then," in the clause in question, as an adverb of time, cannot, however, be avoided. The entire phrase, " *shall* then be living," necessarily relates to time, and to a time indicated by the preceding part of the sentence. The cases cited to show the inclination of the courts to construe the language of wills giving estates to classes of persons, and to the *survivors* of them, as meaning survivors of the testator, do not reach this case.

I have already said, that if the language here in question could be fairly construed to refer to the time of testator's death I should

be disposed so to construe it. In those cases the term *"survivors"* might well be construed to mean survivors of the testator, and, consequently, such construction was given to the term. Such was the case of *Moore* v. *Lyons*, 25 Wend. 119, on which, and the cases therein cited to sustain it, the counsel mainly relies. Then the language was "and from and after her death [that of Mary, the devisee for life] I give and devise the said dwelling-house and lot of land to Susan, Jane and Betsey, three daughters of the said Mary, or to the *survivors or survivor of them*, their or her heirs and assigns forever," and it was held that the words of survivorship referred to the death of the testator, and not to the death of the tenant for life, pursuant to the technical rule that such construction should be adopted, unless from other parts of the will it be manifest that the intent of the testator was otherwise. But this rule is founded upon the technical meaning which has been fixed upon the words *" survivor or survivors,"* in a context similar to that of the will then being considered.

Then the gift was to the three, or to the *survivor* of them. The remainder so given, therefore, vested in such of the three as survived the testator ; a construction of the language *" survivor,"* pursuant to the technical rule. But here the word *" survivor"* does not occur, and there are no words of gift that can be construed as applying to the fourteen nephews and nieces. The first and only disposition of the residue is, not "to my nephews and nieces, or the *survivor or survivors* of them," but "to my nephews and nieces *who shall then be living,"* — the testator then pointing out and specifying the persons *to whom* this residue *is bequeathed,* and not thereby merely limiting the time when a bequest already given shall take effect in possession.

No doctrine can be derived from the leading case of *Moore* v. *Lyons*, or from the English and American cases on the subject, so exhaustingly therein cited, which will refer words indicating time, in the giving of property by will, to the death of the testator, as the time of the vesting of the gift, unless the items of the will are such as will, under the rules of interpretation, bear such reference. The question is one of construction merely of the terms of the bequest, and unless, by a fair construction of them in connection with the whole language of the will, such reference can be borne out, it cannot be adopted, as we have already seen in the case at bar; the language will not bear or admit of any such construction.

In behalf of the representatives of Jane P. McKinstry, one of the nieces who died before the settlement of the estate, it is claimed and argued that, even granting the construction herein above given to be correct, still the time referred to must be limited by the time within which the law requires the estate to be ready for settlement, to wit, at the end of eighteen months from the time of the granting of letters.

In this case the executor was, by the testator, invested with a trust, including the conversion of his real estate into money, which he was, in terms, given no longer time than eighteen months to execute. The residue in question was to be raised, in part, from such sales of real estate, and the executor was not bound to be ready to account and settle up the estate at the expiration of eighteen months, but was left to the exercise of a sound discretion as to the time when that should be done. It is not urged that the excess of time over eighteen months which he took was at all unreasonable.

There being no time fixed by law for the division of the residue, except that when the decree was made, and the time of actual division being within a reasonable time, I think the time when the accounting and settlement was completed, and the decree for division made, must be taken as the time when the right to the shares accrued.

The result is, that the decree of the surrogate should be reversed in so far as it devotes any portion of the residue belonging to the shares represented by the appellants to the representatives of Jane Sanders and Jane P. McKinstry respectively, and that said decree should be so modified as that seven-twelfths of each of said two sums of $1,721.44 given to them, respectively, in said decree, be directed to be paid to the appellants, respectively, in addition to the sums already given them by said decree, as follows, to wit, the sum of $286.90 to each of said six appellants, and the additional sum of $286.90 to said appellant, Mary Ann McKinstry, and that the respondents herein pay the appellants the costs of this appeal.

*Decree affirmed.*